UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of JOHANNES ROESSNER,

Petitioner,

to Take Discovery Pursuant to 28 U.S.C. § 1782 in Aid of Foreign Litigants or Proceedings.

C.A. NO.

DECLARATION OF JÁNOS MORLIN IN SUPPORT OF EX PARTE APPLICATION TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782

JÁNOS MORLIN declares, under penalty of perjury under the laws of the United States of America, as follows:

1. I am attorney licensed under the laws of the Federal Republic of Germany and a partner of SGP Rechtsanwaltsgesellschaft mbH, a law firm with offices in Munich, Ulm, Frankfurt, Hamburg, and Brussels, among others. I am fluent in both written and spoken English. I respectfully submit this Declaration on behalf of Petitioner Johannes Roessner (the "Petitioner" or "Roessner"), one of my firm's clients, in support of an application pursuant to 28 U.S.C. § 1782(a) to obtain discovery from Deutsche Bank Trust Company Americas ("Deutsche Trust"), which is seated in New York, for use in the defense of an action filed by Deutsche Bank AG, Germany, against Roessner and in the prosecution of a counterclaim filed by Roessner, which together are handled in one legal proceeding pending before the Munich Regional Court I (Landgericht München I), Germany (the "German Action"), under the caption *Deutsche Bank AG v. Johannes Rössner*, Case No. 27 O 18319/16. Deutsche Trust is a New York State-chartered FDIC-insured bank, with its principal offices located at 60 Wall Street, New York, New York.

2. I am familiar with the facts set forth herein based upon my legal education and experience, and my representation of Roessner in the German Action.

3. In 2014, Roessner concluded two forward exchange contracts ("FX-Deals") with Deutsche Bank AG involving the currency pair of Russian rubles ("RUB") and Swiss francs ("CHF"). His investment was based on a belief in a strong RUB as against the CHF (i.e.,

Roessner owed CHF in the FX-Deals and was to receive RUB). At the same time and unbeknownst to Roessner at the time, Deutsche Bank AG helped to illegally transfer RUB into USD on a large scale via its Russian Desk with the participation of Deutsche Trust by way of so-called Mirror Trades ("Mirror Trades"), in violation of U.S. and U.K. anti-money laundering laws. For this practice which spanned many years, Deutsche Bank AG was fined by the Financial Conduct Authority, London, UK ("FCA") with penalty notice, as well as by the New York State Department of Financial Services, New York, USA with penalty notice, both dated January 30, 2017 (**Exhibit 1** - Consent Order from N.Y. Department of Financial Services). Roessner alleges that these Mirror Trades had a detrimental effect on his own FX-Deals and that had he known that Deutsche Bank AG was simultaneously working against his positions in the FX-Deals, he would not have entered into the FX-Deals with Deutsche Bank AG. Roessner alleges that the Mirror Trades had a direct and substantial impact on the external value of the RUB, i.e. that the RUB lost value against leading currencies such as Euros ("EUR"), USD or CHF due to the Mirror Trades of Deutsche Bank AG.

4. At the end of 2013, Roessner began discussions with Deutsche Bank AG regarding the possibility of entering into FX-Deals. After several discussions, Roessner opened an account in March 2014 and agreed to set up a securities account and to transfer securities already held at other banks to a securities account at Deutsche Bank AG. The securities were to serve as collateral for the FX-Deals. In July 2014, Roessner then decided to conclude two FX-Deals with Deutsche Bank AG, each with a volume of CHF 2,000,000 and each involving the RUB/CHF currency pair . The FX-Deals each had a term of one year. After significant losses of the RUB against the CHF and EUR, the two FX-Deals were terminated against the will of Roessner in December 2014 by inverse FX-Deals that served to close his positions. The inverse FX-Deals left an open risk position in CHF for Roessner. After a significant devaluation of the CHF against the EUR in January 2015, these inverse FX-Deals were also closed out in January 2015 by offsetting FX-Deals with exchange into EUR. In total, Roessner suffered a loss in the amount of approximately EUR 2,000,000.

5. After Roessner refused to settle the losses from the FX-Deals, Deutsche Bank AG liquidated Roessner's securities provided as collateral. After liquidation of the collateral, Deutsche Bank AG had a residual claim which is being disputed. With regard to this residual claim, Deutsche Bank AG filed a lawsuit against Roessner in October 2016 at the Munich Regional Court I. Roessner filed a motion to dismiss the lawsuit. At the same time, he filed a counterclaim. In the counterclaim, Roessner has asserted claims for

damages based on a lack of information about the Mirror Trades and the influence of the Mirror Trades on the RUB. In addition, he claims that the FX-Deals were improperly closed against his will in December 2014, as a result of which he has suffered significant losses, and that the Mirror Trading effected at the same time as the FX-Deals imposed a disclosure obligation upon Deutsche Bank AG owed to Roessner, which it violated.

6. Between 2011 and at least the spring of 2015, Deutsche Bank AG assisted Russian clients under sanctions to convert RUB with a total value of at least 16 billion USD into USD by means of the Mirror Trades, contrary to legal provisions of the USA and Great Britain. Deutsche Bank AG has thus not only violated various legal provisions. In Roessner's opinion, it also contributed to a considerable extent to the devaluation of the RUB against other currencies, in particular against the EUR or the CHF, through the Mirror Trades. Deutsche Bank AG also executed the Mirror Trades in RUB at the very time in the middle of 2014 at which it concluded the FX-Deals on the RUB in parallel with Roessner. While Roessner, unaware of the Mirror Trades, bet on the RUB, Deutsche Bank AG deliberately contributed to the devaluation of the RUB. Deutsche Bank AG did not inform Roessner about this when concluding the FX-Deals. If the information had been correct, Roessner would not have concluded any FX-Deals with Deutsche Bank AG.

7. The Mirror Trades were settled by the Russian Desk of Deutsche Bank AG, Deutsche Bank Moscow Ltd., a division of Deutsche Bank AG in London, UK, and by Deutsche Trust, a legally independent subsidiary of Deutsche Bank AG in the U.S. Deutsche Trust was responsible for the payment flows in USD.

   The Mirror Trades thereby were executed as follows (for a detailed description of the scheme see also **Exhibit 1**, at paragraph 9 et seq. and in particular paragraph 30 et seq.) :

   A Russian client of Deutsche Bank Moscow Ltd, usually the representative of a corporation registered in Russia, contacted Deutsche Bank Moscow Ltd and requested the purchase of shares in large Russian companies (Russian blue chips). At approximately the same time, another client of Deutsche Bank Moscow Ltd. not resident in Russia, usually a corporation domiciled in a tax haven, contacted Deutsche Bank Moscow Ltd. and asked for the sale of the same amount of shares for USD that had been purchased shortly before by the Russian client. The sale of the shares was usually handled through the legally dependent head office of the Deutsche Bank AG in the UK. Certain payment flows in USD were borrowed from Deutsche Trust. As governmental investigations have revealed, there were always close links between the Russian share buyer and the foreign share seller, e.g. the shareholders of

the buyer of the shares and the seller of the shares were closely related if not identical in many cases. Thus, the Russian share buyers were able to procure the shares for the foreign share sellers. The latter could then sell the shares for USD. The aim of the Mirror Trades was exclusively to exchange RUB for USD, to disguise such transactions as legitimate investment transactions and to bypass restrictions followed by financial institutions to enforce sanctions against Russia after its annexation of Crimea in March 2014. The scale of sales of RUB in such large amounts had a downward effect on the value of RUB as against other currencies on foreign exchange markets.

8. Because billions of dollars of illegal RUB transactions were effected by Deutsche Bank AG at the same time that Roessner was encouraged to conduct the FX-Deals giving him a long exposure to RUB, he alleges that the Mirror Trades negatively influenced the value of the RUB to his detriment in the FX-Deals.

9. As part of the German Action, Roessner has commissioned an economist to show, inter alia, the influence of Mirror Trades on the external value of the RUB. The purpose of this economic analysis is to establish one or more defenses in the German Action, to assist in demonstrating a reduction of the damages claimed in the case, and to aid in the prosecution of the counterclaim. In the opinion of Roessner's economic expert, the Mirror Trades would likely have had a considerable influence on the external value of the RUB on foreign exchange markets. However, a more detailed analysis and valuation of this influence could not be carried out without the underlying trading data of the Mirror Trades.

Roessner therefore seeks information from Deutsche Trust about the specific procedure of the Mirror Trades to the extent conducted in the United States, and in particular the details of and specific dates of the Mirror Trades (day and volume of the respective Mirror Trades in the period between January and December 2014). Upon information and belief, all of this information has already been provided by Deutsche Trust to regulators who have brought enforcement proceedings against Deutsche Bank AG.

10. Deutsche Trust, a legally independent subsidiary of Deutsche Bank AG in the U.S., is not a party to the German Action.

11. With respect to documents, Roessner therefore believes that Deutsche Trust possesses documents concerning, among other things:

    a. The daily volume of the Mirror Trades between January and December 2014;

    b.  Detailed trading data and records reflecting the dates and amounts of specific trades involving RUB and any summaries of such data, including any spreadhseets reflecting the trades (with client-identifying information redacted); and

    c.  To the extent they exist, analyses of such trading furnished to New York regulators in connection with the enforcement proceedings described above.

12.  In addition, Roessner seeks to take the deposition of Deutsche Trust by one or more witnesses who can testify concerning the above subjects; and to authenticate documents produced pursuant to the subpoena proposed to be served herein. Roessner seeks these documents and the depositon solely for use in the German Action and not for any improper purpose.

13.  I am not aware of any German laws or restrictions that would preclude the use of the discovery sought in this application.

14.  As a result, and for all of the foregoing reasons, I respectfully seek, on behalf of the Petitioner, leave of this Court to allow Petitioner's United States counsel, Ralph M. Stone of Stone Law Group PLLC, to serve on Deutsche Trust a subpoena compelling the production of documents and testimony as suggested in the proposed subpoena attached hereto as Exhibit 2 (or subpoenas substantially similar thereto).

I declare under penalty of prejury under the laws of the United States of America that the foregoing is true and correct. Executed this 12th day of July 2021, at Munich, Germany.

*/s/ János Morlin*

János Morlin